**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **AMANDA N. LATTA,** | |
| Plaintiff, | Civil Action No. _____ |
| v. | |
| **U.S. DEPARTMENT OF EDUCATION,** 400 Maryland Avenue, SW Washington, D.C. 20202 | |
| And | |
| **MIGUEL CARDONA, SECRETARY OF EDUCATION, IN HIS OFFICIAL CAPACITY,** 400 Maryland Avenue, SW Washington, D.C. 20202 | |
| Defendants. | |

## <u>VERIFIED COMPLAINT</u>

Plaintiff Amanda N. Latta brings this civil action against Defendants U.S. Department of Education and Miguel Cardona, in his official capacity as the Secretary of Education, for declaratory and injunctive relief, and alleges as follows:

### INTRODUCTION

Amanda Latta, like millions of other college students who obtained government student loans to pay for college, agreed to repay them. She is doing just that. Of course, she would like to take advantage of any legal program allowing her to cancel or reduce her debt.

Other college students have recognized their duty to pay back their student loans and have done so—in full. Others did not—they defaulted. The Department of Education declared them to

be in default and paid debt collectors to collect those student debts, with penalties, additional interest and collection fees.

Shortly before the midterm elections, the Biden administration announced that it would forgive up to $20,000 of student debt, ostensibly because of the COVID pandemic–even though those same students had been excused from making any payments for the last two years. This debt forgiveness could have been effectuated legally by Congress, but after Congress declined to do so, President Biden unilaterally declared he would instruct the Department of Education to do so without Congress. This was contrary to the Department of Education's prior determination that such a debt forgiveness program was illegal.

As a recent graduate just starting her career, Ms. Latta could put $10,000 to good use, but she also recognizes the problematic legal nature of the loan forgiveness program and that it is unfair to those who previously worked hard to pay off their student loans. She also knows that if she accepts forgiveness which is later determined to be illegal, the Department of Education can, pursuant to her promissory note and the law, later demand that she pay it back—not only the original principal amount, but additional late fees, an increased interest rate, and collection fees. Therefore, Ms. Latta is asking this Court, for herself and others similarly situated, to stop this illegal scheme now before it irreparably harms them.

## FACTS

1. Curtailing the rising costs of higher education and student loans has been a vigorously debated topic in public and Congress.

2. To incentivize payments and offset some student loans, Congress has enacted various student loan forgiveness programs, including the Public Service Loan Forgiveness Program, 20 U.S.C. § 1087e(m), the Teacher Loan Forgiveness Program, 20

U.S.C. § 1078-10, the Closed School Discharge Program, 20 U.S.C. § 1087(c), and the Total and Permanent Disability Discharge Program, 20 U.S.C. § 1087(a)(1).

3. Congress has not, however, enacted a comprehensive debt forgiveness program for all, or even a substantial portion of, federal student loan borrowers.

4. Congress has not appropriated any funds to disburse to student loan borrowers, either through loan forgiveness or through direct payments to those who have already paid their loans. *See* 20 U.S.C. § 1087a(a) (appropriating sums necessary "to make loans"). The Department has announced that it will do both without obtaining Congressional approval. U.S. Dep't of Educ., *One-time Federal Student Loan Debt Relief*, Federal Student Aid, https://perma.cc/L2E6-DGF6 (last visited Nov. 17, 2022).

5. Any broad debt forgiveness program related to federal student loans must come from a congressionally prescribed amendment to the Higher Education Act, as it is Congress' duty to write the laws.

6. House Speaker Nancy Pelosi (D-CA) explained that President Biden does not have authority to cancel student loan debt:

> "People think that the President of the United States has the power for debt forgiveness," she said. "He does not. He can postpone, he can delay, but he does not have that power." Pelosi argued that student loan forgiveness can only be accomplished through "an act of Congress."

Adam S. Minsky, *Pelosi: President Biden Does Not Have Power to Cancel Student Loan Debt – What It Means For Borrowers*, FORBES (Jul. 28, 2021), https://tinyurl.com/PelosiForbes.

7. When Congress declined to enact broad student debt relief, the Biden administration exceeded its authority and transgressed the separation of powers by unilaterally changing the law.

8. On August 24, 2022, President Biden announced through a press conference that the Department of Education (the "Department") would implement a forgiveness plan providing for $10,000 to $20,000 in forgiveness for eligible borrowers. U.S. Executive Office of the President, *Remarks by President Biden Announcing Student Loan Debt Relief Plan*, The White House, https://tinyurl.com/fwvjx5tr (last visited Nov. 17, 2022). This is commonly known in the media as the Biden Loan Forgiveness Program (the "Biden LFP").

9. On the same date, acting under the supposed authority vested in it due to a two-and-a-half-year-old pandemic, the Department of Education (the "Department") also announced that it would forgive up to $20,000 per student in student loan debt, even though that would require a modification of various United States statutes and regulations. *Biden-Harris Administration Announces Final Student Loan Pause Extension Through December 31 and Targeted Debt Cancellation to Smooth Transition to Repayment,* U.S. Dep't of Education (Aug. 24, 2022), https://tinyurl.com/3zyb83h2 ("Department Announcement").

10. The Biden LFP will affect up to tens of millions of student loan borrowers and cost the taxpayers an estimated $400,000,000,000 to over $500,000,000,000. *E.g.*, Phillip L. Swagel, Congressional Budget Office, Costs of Suspending Student Loan Payments and Canceling Debt (Sept. 26, 2022), https://tinyurl.com/44hjztw9 (responding to a congressional inquiry by stating "that the cost of student loans will increase by about an additional $400 billion" as a result of the canceling of debt).

11.    Not only does this debt forgiveness program violate the Constitution, it is also arbitrary, capricious, an abuse of discretion, and violates the procedures for properly using national emergency powers.

12.    The program's potential illegality leaves student loan borrowers subject to default, future civil penalties, increased interest rates via interest upon interest, debt acceleration, adverse credit ratings, and the uncertainty of their legal rights. *See* U.S. Dep't of Educ., *Student Loan Delinquency and Default*, Federal Student Aid, https://tinyurl.com/yc6bn3vn (last visited Nov. 17, 2022).

13.    Plaintiff Latta believes that the Biden LFP is illegal and that it is morally wrong to fail to pay her obligations under the promissory note if the Biden LFP is not legal, but intends to participate in the Biden LFP if it is legal.

## PARTIES

14.    Plaintiff Amanda N. Latta received her undergraduate degree from Waynesburg University. Ms. Latta received federal student aid through the Direct Loan Program to pay for her undergraduate studies.

15.    Plaintiff Latta has four William D. Ford Federal Direct Loans totaling over $20,000 issued and administered by the Department of Education.

16.    Plaintiff Latta did not receive any Pell Grants.

17.    To obtain her loans through the Department of Education, Ms. Latta, like every other Direct federal student loan borrower, executed a master promissory note ("MPN"). Ex. A, which is a true and accurate copy of the original master promissory note.

18.    The MPN governs the terms and conditions of payment, default remedies, and possible payment waivers.

19.    The Department of Education holds Ms. Latta's loans, and she made less than $125,000 last year.

20.    Plaintiff Latta is entitled to forgiveness of $10,000 of her student loans if the Biden LFP is legal, but she will be subject to debt acceleration, increased interest rates, default penalties, harm to her credit rating and other harms if she accepts the loan forgiveness and it is not legal.

21.    Because Ms. Latta never received a Pell Grant, she is ineligible for the full $20,000 in debt forgiveness under the Education Department's rule.

22.    Under the Biden LFP, Plaintiff Latta would be eligible for $20,000 of loan forgiveness if she had received a Pell grant.

23.    To require borrowers to proceed with an application for debt forgiveness "without knowing whether the [] scheme is valid would impose a palpable and considerable hardship," and "the public interest would be well served by a prompt resolution of the" validity of the Biden LFP. *Thomas* v. *Union Carbide Agr. Prod. Co.*, 473 U.S. 568, 581 (1985).

24.    Plaintiff Latta also asserts that, in the event that the Biden LFP is permissible (other than as to the limitation regarding non-receipt of Pell grants), the Biden LFP should have allowed her to receive forgiveness of $20,000 of debt.

25.    The deadline to complete applications and related submissions for the Biden LFP was initially, upon information and belief, December 31, 2022. That date is currently

set for December 31, 2023. The deadline to opt out of automatic loan forgiveness is unclear as of the time of the filing of this Complaint.

26. Defendant U.S. Department of Education is an agency of the United States government subject to the Administrative Procedures Act (the "APA").

27. Defendant Miguel Cardona is the U.S. Secretary of Education. The Secretary is sued in his official capacity as the head of the U.S. Department of Education.

## JURISDICTION & VENUE

28. This Court has subject-matter jurisdiction over this case because it arises under the laws of the United States. *See* 5 U.S.C. § 702; 28 U.S.C. §§ 1331, 2201-2202.

29. Venue is proper in this Court because this is an action against an officer and an agency of the United States, a plaintiff resides in this judicial district, and no real property is involved in the action. 28 U.S.C. § 1391(e). Venue is proper in the Eastern Division of this Court because Plaintiff Latta resides in this division.

## BACKGROUND

### The Department of Education's Grant and Loan Programs

30. The Department of Education provides financial aid for students through its statutorily created grant and loan programs. *See* 20 U.S.C. § 1087a.

31. Federal grants constitute "financial aid that generally doesn't have to be repaid." U.S. Dep't of Educ., *Types of Aid*, Federal Student Aid, https://bit.ly/3S51Heu (last visited Nov. 17, 2022).

32. The Federal Pell Grant Program provides students with financial aid that does not need to be repaid if their parents' income was below a certain threshold when

they applied for the grant. U.S. Dep't of Educ., *Federal Pell Grant Program*, Federal Student Aid, https://bit.ly/3DKV6BG (last visited Nov. 17, 2022); 20 U.S.C. § 1070a.

33.    By contrast, federal loans are "[b]orrowed money for college or career school . . . [that] must be repaid with interest." *Types of Aid, supra*.

34.    The Department of Education provides new loans under the Direct Loan Program and continues to administer loans under the Federal Family Education Loan Program and the Perkins Loan Program.

35.    Under the William D. Ford Federal Direct Loan Program (the "Ford Direct Loan Program"), the Department of Education makes loans *directly* to borrowers, including Ms. Latta, who are then responsible for repaying the government, including interest. *See* 20 U.S.C. § 1087a.

36.    Under the Federal Family Education Loan Program (the "FFEL Program"), the Department of Education paid lenders to make student loans and guaranteed repayment. 20 U.S.C. § 1071. The authority to issue new loans under the FFEL Program expired in 2010, although many of the loans are still outstanding. *See* 20 U.S.C. § 1071(d). FFEL loans account for about $213.7 billion of outstanding student loan debt. *See* U.S. Dep't of Educ., *Federal Student Loan Portfolio*, Federal Student Aid, https://bit.ly/3qYd5Nm (last visited Nov. 17, 2022).

37.    Under the Perkins Loan Program (the "Perkins Program"), colleges and universities made loans to students, and the Department of Education guaranteed the repayment of the loans. 20 U.S.C. § 1087aa. The authority to issue new loans under the Perkins program expired in 2017. 20 U.S.C. § 1087aa(b)(2). Perkins Loans account for

about $4 billion of outstanding student loan debt. *See Federal Student Loan Portfolio, supra*.

38.   The Ford Direct Loan Program borrowers are eligible for the Biden LFP, but not all of the FFEL Program and the Perkins Program borrowers are.

**The Department of Education's Debt Forgiveness Program.**

39.   In 2020, then-candidate Biden began proposing a student debt relief program that would appease fellow party members.

40.   For instance, on March 22, 2020, then-candidate Biden tweeted, "we should forgive a minimum of $10,000/person of federal student loans, as proposed by Senator Warren and colleagues." Joseph Biden (@JoeBiden), Twitter (Mar. 22, 2020, 7:28 PM), https://tinyurl.com/bddrc3ym.

41.   On August 24, 2022, President Biden announced the Biden LFP.

42.   The day before announcing the program, the Department, in conjunction with the Department of Justice Office of Legal Counsel, released two legal memoranda purporting to identify the authority of the U.S. Secretary of Education to cancel student loan debt on a categorical basis. Lisa Brown, U.S. Dep't of Educ., The Secretary's Legal Authority for Debt Cancellation (Aug. 24, 2022), https://tinyurl.com/5n65cjem; Use of the HEROES Act of 2003 to Cancel the Principal Amounts of Student Loans, O.P. O.L.C. (slip opinion) (2022), https://tinyurl.com/3fadrhvf.

43.   The Department claimed that the HEROES Act of 2003, 20 U.S.C. § 1098bb, authorized the debt cancellation because of the existence of a national emergency as announced in the March 18, 2020, presidential proclamation declaring

COVID-19 a national emergency and two subsequent continuations of the declaration. The Secretary's Legal Authority for Debt Cancellation, *supra*.

44.    However, prior to the August announcements and related memoranda, President Biden and his officials announced that the emergency is over. For example, in April 2022, the Administration lifted Title 42 restrictions on immigration that were based on the threat of COVID-19 while noting that "97.1% of the U.S. population lives in a county identified as having 'low' COVID- 19 Community Level." *CDC Public Health Determination and Termination of Title 42 Order*, Ctr. for Disease Control & Prevention (Apr. 1, 2022), https://tinyurl.com/CDCNotice.

45.    On September 18, 2022, President Biden again declared that "the pandemic is over." Rebecca Falconer, *Biden: "The pandemic is over"*, Axios (Sep. 18, 2022), https://tinyurl.com/AxiosPandemic.

46.    On Nov. 15, 2022, the Senate, in bipartisan agreement, voted 62-36 to end the national emergency declaration. Katy Stech Ferek, *Senate Votes to End Covid-19 Emergency Declaration*, The Wall Street Journal (Nov. 15, 2022), https://tinyurl.com/bdhveuuy.

47.    Despite the earlier declarations that the stated justification for the Biden LFP was over, on October 12, 2022, the Department of Education published its official document (the "Official Waiver") in the Federal Register, relying on the HEROES Act and the COVID pandemic, to modify federal statutes and regulations to cancel up to $20,000 in debt for eligible borrowers. Federal Student Aid Programs, 87 Fed. Reg. 61512 (Oct. 12, 2022).

48.   Under the Official Waiver, the Secretary purportedly forgave student debt, "notwithstanding" any other provision of law, by modifying 20 U.S.C. § 1087, which applies to the Direct Loan Program under 20 U.S.C. §§ 1087a, 1087e; 20 U.S.C. § 1087dd(g); 34 C.F.R. pt. 674, subpart D; 34 C.F.R. § 682.402; and 34 C.F.R. § 685.212 to provide that certain loan borrowers were eligible for debt forgiveness. Federal Student Aid Programs, 87 Fed. Reg. at 61514.

49.   The HEROES Act requires the Secretary to publish what "terms and conditions [are] to be applied in lieu of such statutory and regulatory provisions." 20 U.S.C. § 1098bb(b)(2).

50.   The National Emergencies Act requires the President to "specif[y] the provisions of law under which he proposes that [the Department of Education] will act." 50 U.S.C. § 1631. This must be done either in the "declaration of national emergency" or in an "Executive order[] published in the Federal Register." *Id*. The President did neither.  His public announcement at a press conference that the Secretary would discharge student debt does not satisfy the requirements of the National Emergencies Act. *See Remarks by President Biden Announcing Student Loan Debt Relief Plan*, *supra*; *see also* Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, 85 Fed. Reg. 15337 (specifically invoking the Secretary of Health and Human Services emergency authority).

51.   After the administration's first announcement of the Biden LFP, the Department of Education has repeatedly modified the eligibility criteria, apparently to deprive certain plaintiffs standing to challenge the program.

52. For instance, when the President and Department of Education announced the Biden LFP, all federal borrowers with annual income during the pandemic under the income cap who received a Pell Grant in college were eligible for up to $20,000 in debt cancellation. Department Announcement, *supra*. Borrowers who met those income standards but did not receive a Pell Grant were eligible for up to $10,000 in relief. *Id.* Certain loans would be automatically forgiven without any action by the borrowers. *Id.*

53. Thereafter several lawsuits were filed, including one asserting a claim that the automatic forgiveness would harm that plaintiff because of a negative tax treatment in his State. Am. Compl. 3, *Garrison v. U.S. Dep't of Educ.*, No. 1:22-cv-01895-RYL-TAB (S.D.Ind. Oct. 10, 2022).

54. The Department tried to moot that claim by changing the Biden LFP to allow such parties to "opt out," Pl.'s Reply to Pl.'s Mot. for Prelim. Inj. at 2, *Garrison*, No. 1:22-cv-01895-RYL-TAB, although at the time of filing this complaint, it is unclear how and by what date a person must exercise such option. This option is not contained in the Official Waiver. *See* Federal Student Aid Programs, 87 Fed. Reg. at 61514.

55. Thereafter, the Biden LFP was changed again to send checks to repay those who had made payments during the COVID pandemic up to the remaining amount of forgiveness after their debt had been extinguished. *One-time Federal Student Loan Debt Relief, supra*. That also is not contained in the Official Waiver and was never published in the Federal Register. *See* Federal Student Aid Programs, 87 Fed. Reg. at 61514.

56. The Department does not cite any congressional authority or any congressional appropriation for these direct payments to the borrowers or former borrowers.

57.   The Department claims in the Official Waiver that under the HEROES Act the Secretary can take whatever actions he deems necessary without notice and comment. *Id.* at 61512.

## PLAINTIFF AMANDA LATTA'S STANDING

58.   Pursuant to Plaintiff's MPN, Plaintiff Latta "promise[d] to pay to ED all loan amounts disbursed under the terms of th[e] MPN, plus interest and other charges and fees that may become due . . . ." Ex. A at 2.

59.   The MPN directs "[y]ou must repay the full amount of the loans made under this MPN, plus accrued interest." Ex. A at 4.

60.   If she fails to pay the entire amount disbursed plus interests and other charges and fees, she will be liable for "reasonable collection costs, including but not limited to attorney fees, court costs, and other fees." Ex. A at 2.

61.   The MPN further states:

LATE CHARGES AND COLLECTION COSTS: We may collect from you:  A late charge of not more than six cents for each dollar of each late payment if you do not make any part of a required installment payment within 30 days after it becomes due, and any other charges and fees that are permitted by the Act related to the collection of your loans. If you default on a loan, you must pay reasonable collection costs, plus court costs and attorney fees.
Ex. A at 4.

62.   Additionally, if she defaults on her loan, the Department can require her to pay the entire unpaid balance of the loan at once, plus a six percent late fee, and a capitalization of interest (which will bear interest, also known as interest on interest).  Ex. A at 4.

63.   Before the pandemic payment pause, the Department enforced loan repayments.  From January 2018 through September 2018, it retrieved over $5.4 billion

in defaulted loans. *See* U.S. Dep't of Educ., *Default Rates*, Federal Student Aid, https://tinyurl.com/2w3pyf6d (last visited Nov. 17, 2022). $662 million of that was from wage garnishments. *See id.*

64.     Upon information and belief, the Department contracts with private entities to collect on its loans, and these entities earn income from the more debt repayments they bring in. Mark Kantrowitz, *How Much Do Federal Student Loan Servicers Make Per Loan*, The College Investor (updated Aug. 24, 2022), http://tinyurl.com/3wvu3eut; *see* U.S. Dep't of Educ., *Private Collection Agencies – Archives*, Federal Student Aid, https://tinyurl.com/4b82fmda (last visited Nov. 30, 2022).  Consequently, the private entities and the Department will be incentivized to seek repayment from the borrowers if the program is found to be illegal.

65.     The MPN further states: "If we do not enforce or insist on compliance with any term of this MPN, it does not waive any of our rights. No provision of this MPN may be modified or waived, unless we do so in writing." Ex. A at 4.

66.     The only other provision allowing modifications to the MPN provides that "[a]ny [legal] amendment to the [Higher Education Act of 1965 (the "HEA")] that affects the terms of this MPN will be applied to your loans . . . ." Ex. A at 6.

67.     The Biden LFP does not *legally* amend the HEA.

68.     The MPN also states: "If you default, the default will be reported to nationwide consumer reporting agencies (credit bureaus) and will significantly and adversely affect your credit history. A default will have additional adverse consequences as explained in the Borrower's Rights and Responsibilities Statement."  Ex. A at 4.

69.     According to the federal government, if Plaintiff Latta defaults on the loan, her credit score will be damaged, and it "may take years to reestablish a good credit rating." *Student Loan Delinquency and Default*, *supra*.

70.     If Plaintiff Latta defaults on the loan, she will "lose eligibility for additional federal student aid" if she continues her education. *Id.*

71.     Plaintiff Latta has applied for, and is eligible for, the $10,000 in forgiveness and would accept it if it is determined to be legal.

72.     Plaintiff Latta does not wish to participate in an illegal government program that would subject her to increased liability.

73.     The Biden LFP may force the supposed forgiveness upon other borrowers in similar situations without their advance knowledge or permission because the Department announced that it will automatically forgive over eight million loans without the advance knowledge or consent of the borrowers. Department Announcement, *supra*.

74.     Plaintiff Latta has a limited time to apply for forgiveness under the Debt Forgiveness Program, or she must forgo the financial benefit of the program because of uncertainty about its legality.  The Education application process is currently blocked or on hold.

75.     The Code of Federal Regulations ("CFR") has specific provisions for what a borrower, such as Plaintiff Latta, may assert as defenses for non-payment of a student loan.  Specifically, 34 C.F.R. § 685.206(c) and (e), and 34 C.F.R. § 685.222 govern defenses to repayment (the "CFR Defenses").

76. "Those defense[s] to repayment standards have changed multiple times in recent years" via the Administrative Procedures Act process. U.S. Dep't of Educ., Issue Paper #6: Borrower Defense to Repayment (2021), https://tinyurl.com/32jwn43y.

77. The Biden LFP is not included in the CFR Defenses and there are no pending proposed rules under the Administrative Procedures Act which would modify those CFR sections.

78. Any loan forgiveness supposedly granted under the Biden LFP will not be enforceable against the government in the future because it is not sanctioned under the MPN or the CFR Defenses.

79. Further, the "[p]ower to release or otherwise dispose of the rights and property of the United States is lodged in the Congress by the Constitution." *Royal Indem. Co.* v. *United States,* 313 U.S. 289, 294-95 (1941); see U.S. Const. art. IV, § 3, cl. 2 ("The Congress shall have Power to dispose of . . . Property belonging to the United States.").

80. Government payments erroneously or illegally made are "in direct violation of . . . the Constitution." *Barrett Refining Corp.* v. *United States*, 242 F.3d 1055, 1063 (Fed. Cir. 2001) (quoting *Fansteel Metallurgical Corp.* v. *United States*, 172 F.Supp. 268, 270 (Ct. Cl. 1959)).

81. An individual who receives an overpayment from the government, regardless of whether the overpayment arose under a contract, is "liable to refund it" to the United States. *Heidt* v. *United States*, 56 F.2d 559, 560 (5th Cir. 1932).

82. The United States is barred from exercising its right to recover overpayments only when Congress has "clearly manifested its intention to raise a

statutory barrier." *Agility Pub. Warehousing Co. K.S.C.P.* v. *United States*, 969 F.3d 1355, 1366 (Fed. Cir. 2020) (quoting *United States* v. *Wurts*, 303 U.S. 414, 416 (1938)).

83.    The Department has in the past made policy reversals and double reversals based on who the Secretary is. *See e.g.*, Stacy Cowley, *A DeVos System Allowed 12 Minutes to Decide Student Loan Forgiveness*, The New York Times (Mar. 19, 2021), https://tinyurl.com/yadjf9v8 (Secretary DeVos disliked the loan forgiveness program from the prior administration.  The loan forgiveness applications which had languished under Obama were denied under Trump, but then reversed under Biden.).

84.    To justify the use of the HEROES Act, the Biden administration reversed the position of the Department by revoking a previous memo from the Department of Education's Office of Legal Counsel, which stated that the HEROES Act could not be used to justify broad debt forgiveness. *See* Reed Rubinstein, U.S. Dep't of Educ., Student Loan Principal Balance Cancellation, Compromise, Discharge, and Forgiveness Authority (Jan. 12, 2021), https://bit.ly/3LBA36n.

85.    Another illustration of such enforcement reversal is the Department's decision to send to student borrowers certain amounts they had already repaid on their loans during the pandemic loan repayment freeze.  *See One-time Federal Student Loan Debt Relief*, *supra*.

86.    Neither Plaintiff Latta nor other borrowers can rely upon the possible assertion of estoppel against the Department to avoid future repayment (and penalties, fines, increased interest, and collection costs) because equitable estoppel generally cannot be asserted against the government. *Heckler* v. *Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 60 (1984).

87.    "[T]he United States is neither bound nor estopped by acts of its officers or agents in entering into an arrangement or agreement to do or cause to be done what the law does not sanction or permit."  *Utah Power & Light Co.* v. *United States,* 243 U.S. 389, 409 (1917); *see also Royal Indem. Co,* 313 U.S. at 294-95.  This lack of estoppel against unlawful acts of officers or agents would apply to the Secretary, and even the President.

88.    "Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law," and "those who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law."  *Heckler*, 467 U.S. at 63.

89.    It is further clear that participants in the Biden LFP have notice that the program is of doubtful validity and so, even if the government could be estopped, the participants cannot later satisfy the basic element of reasonable reliance.  See *United States v. Boccanfuso*, 882 F.2d 666, 669-70 (2d Cir. 1989).

90.    This doubtful validity became clearer when two courts recently either expressed doubts about its validity or explicitly said so. *Brown* v. *U.S. Dept. of Ed.*, No. 4:22-cv-0908-P (N.D.Tex Nov. 10, 2022) ("[The] Court DECLARES UNLAWFUL and VACATES the [Biden Loan Forgiveness] Program."); *Nebraska* v. *Biden*, No. 22-3179, 2022 WL 16912145, at *1-2 (8th Cir. Nov. 14, 2022) (granting an injunction against the operation of the Biden LFP because of "the irreversible impact the Secretary's debt forgiveness action would have as compared to the lack of harm an injunction would presently impose").

91.    For the foregoing reasons, Plaintiff Latta believes that the program is illegal and will subject her to increased liability and will harm her credit rating if she participates.

92.    Plaintiff Latta's harm is currently accruing because she is faced with the Hobson's choice of (a) seeking and accepting a $10,000 loan forgiveness knowing that she may be facing an acceleration of debt, incurring increased interest, incurring collection fees, and negative credit ratings impact or (b) forgo the $10,000 debt forgiveness to which she would be entitled if the Biden LFP is found to be legal and enforceable. *See e.g.*, *Blue Shield of Virginia* v. *McCready*, 457 U.S. 465, 483 (1982) (Court recognized the "offer of a Hobson's choice to [health plan] subscribers" "to choose between visiting a psychologist and forfeiting reimbursement, or receiving reimbursement by forgoing treatment by the practitioner of their choice").

93.    If she accepts choice one, she will be in the forever purgatory of not legally knowing if she will be liable for her supposedly forgiven student loans, plus additional liabilities.

94.    She will also be violating the MPN wherein she promised to pay back her student loans, which she believes to be morally improper unless they have been legally forgiven.

95.    If she accepts choice one and contests any future effort to collect her supposedly forgiven student loans and a court determines that her student loans were not forgiven, she cannot be put back into the status as it exists today because of the additional liabilities.

96.   If she accepts choice two, then she loses the opportunity to receive a possibly legal benefit of $10,000.

97.   In order to pursue choice two, she must opt out of the Biden LFP as soon as she is permitted to do so on the Department's website.

98.   Plaintiff Latta, therefore, needs a judicial declaration at this time of her rights and liabilities with respect to this conflict. *See e.g.*, *State* v. *Yellen*, 539 F.Supp.3d 802, 814 (S.D. Ohio 2021) (Plaintiff "need[s] to know the terms of the 'deal'" into which Plaintiff wishes to enter, and "need[s] to know them at the time [Plaintiff] file[s] suit, not later").

## CLAIMS FOR RELIEF

### COUNT I
### The Department of Education's action is invalid under 5 U.S.C. § 706(2)(D) for failure to follow proper rulemaking procedures

99.   Plaintiff incorporates all her prior allegations.

100.   The APA requires courts to "hold unlawful and set aside agency action[s]" that are adopted "without observance of procedure required by law." 5 U.S.C. § 706(2).

101.  Because the Department adopted the Program without going through the notice and comment process, Plaintiff was deprived of her "procedural right to protect [her] concrete interests." *Texas* v. *EEOC*, 933 F.3d 433, 447 (5th Cir. 2019) (cleaned up) ("A violation of the APA's notice-and-comment requirements is one example of a deprivation of a procedural right.").

102.  Plaintiff Latta is one of the millions of Americans who is ineligible for the full $20,000 in debt forgiveness because she did not receive a Pell Grant in college.

103.  If the Department is going to provide debt forgiveness, Plaintiff should not be penalized because she did not receive a Pell Grant and her student loan debt should be forgiven in the amount of $20,000 instead of being limited to $10,000.

104.  Plaintiff is entitled to present her views to the Department in a notice and comment period.

105.   The APA obligates agencies to subject their substantive rules to notice and comment. 5 U.S.C. § 553.

106.   A "rule" is "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . . ." 5 U.S.C. § 551(4).

107.  Legislative rules typically "grant rights, impose obligations, or produce other significant effects on private interests." *State of Ohio Dep't of Hum. Servs.* v. *U.S. Dep't of Health & Hum. Servs., Health Care Fin. Admin.*, 862 F.2d 1228, 1233 (6th Cir. 1988) (citation omitted).

108.  Moreover, because a "rule that adds a new requirement to a set of existing requirements is substantive," *St. Francis Health Care Ctr.* v. *Shalala*, 205 F.3d 937, 949 (6th Cir. 2000), the APA requires an agency "to use the same notice-and-comment process to amend or repeal a rule as used to promulgate it," *Gun Owners of Am., Inc.* v. *Garland*, 19 F.4th 890, 899 n. 5 (6th Cir. 2021); *Perez* v. *Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015).

109.  The Biden LFP is a legislative rule.  It implements a policy of eliminating or reducing debt obligations for certain individuals. 5 U.S.C. § 551(4). It "grant[s] rights" by promising to eliminate individuals' debt, it "impose[s] obligations" on the Department

to forgive debt, and it produces "significant effects on private interests." *See State of Ohio Dep't of Hum. Servs.*, 862 F.2d at 1233.

110. The Program also effectively amends or repeals the Department's existing regulations that prohibit the Department from forgiving debt except under certain narrow circumstances. *See U.S. Telecom Ass'n* v. *FCC*, 400 F.3d 29, 35 (D.C. Cir. 2005) (If the agency "effects a substantive change in the regulation, notice and comment are required") (cleaned up).

111. In addition, to the extent the Biden LFP "pertain[s]" to Title IV of the Higher Education Act, the Department was also required to use "negotiated rulemaking" to develop the rule. 20 U.S.C. § 1098a(b)(2); *see The Negotiated Rulemaking Process for Title IV Regulations—Frequently Asked Questions*, U.S. Dep't of Educ., https://bit.ly/3SCFqFf (last visited Nov. 17, 2022).

112. The Department adopted the Biden LFP without publishing prior notice and affording Plaintiffs and other members of the public an opportunity to submit written comments.

113. The Department also did not adopt the Biden LFP through the "negotiated rulemaking" process. Because the Program is a legislative rule that did not go through the proper procedures, the Program must be held unlawful and set aside. 5 U.S.C. § 706(2)(D).

## COUNT II
**The Department of Education's action is unlawful under 5 U.S.C. § 706(2)(B) and (C) because the Secretary's invocation of the HEROES Act without an express directive from the President according to the National Emergencies Act exceeds his statutory authority and is not in accordance with the law.**
**50 U.S.C. § 1631.**

114.  Plaintiff incorporates all of her prior allegations.

115.  The Secretary's authority under the HEROES Act requires not only a declared national emergency but also for the President to specifically invoke the HEROES Act's national emergency powers.

116.  Under the National Emergencies Act, 50 U.S.C. § 1631,

When the President declares a national emergency, no powers or authorities made available by statute for use in the event of an emergency shall be exercised unless and until the President specifies the provisions of law under which he proposes that he, or other officers will act. Such specification may be made either in the declaration of a national emergency, or by one or more contemporaneous or subsequent Executive orders published in the Federal Register and transmitted to the Congress.

117.  The Secretary's authority to modify or waive provisions related to student loans is dependent on the application of the HEROES Act. Federal Student Aid Programs, 87 Fed. Reg. at 61514.

118.  The HEROES Act, in turn, only allows for waiver and modification in connection with war or other military operations or national emergencies. 20 U.S.C. § 1098bb.

119.  Without a specific directive from the President invoking the provisions of the HEROES Act, the Secretary has no authority to act. *See* Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, 85 Fed. Reg. 15337 (specifically invoking the Secretary of HHS's national emergency powers,

but not giving the Secretary of the Department of Education any powers to forgive student debt).

120. Neither the President's extensions of the national emergency nor any subsequent declaration followed the procedures set forth in the National Emergencies Act for invoking the Secretary's national emergency powers. *E.g.*, Continuation of the National Emergency Concerning the Coronavirus Disease 2019 (COVID-19) Pandemic, 87 Fed. Reg. 10289.

121. Because the President has not followed the procedures outlined in the National Emergencies Act for invoking the Secretary's power under the HEROES Act, the Secretary has no legal authority to rely on the national emergency to forgive student loans.

122. The Secretary's actions violate 5 U.S.C. § 706(2)(B) and (C).

**COUNT III**
**The Secretary's action violates 5 U.S.C. § 706 (2)(B) and (C) because it is unlawful under Article I, § 9 and Article IV § 3, cl. 2 of the Constitution**

123. Plaintiff incorporates all of her prior allegations.

124. Article I, § 9, of the Constitution provides: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations by Law." This Clause is intended "to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents or the individual pleas of litigants." *Off. of Pers. Mgmt.* v. *Richmond*, 496 U.S. 414, 428 (1990). Accordingly, "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Id.* at 424 (quoting *Cincinnati Soap Co.* v. *United States*, 301 U.S. 308, 321 (1937)).

- 24 -

125. The Omnibus Budget Reconciliation Act of 1993 authorized the funding of the William D. Ford Federal Direct Loan Program. Omnibus Budget Reconciliation Act of 1993, § 4, 20 U.S.C. § 1087a (1993). As amended, 20 U.S.C. § 1087a(a) provides that:

> There are hereby made available, in accordance with the provisions of this part, such sums as may be necessary (1) to make loans to all eligible students (and the eligible parents of such students) in attendance at participating institutions of higher education selected by the Secretary, to enable such students to pursue their courses of study at such institutions during the period beginning July 1, 1994; and (2) for purchasing loans under section 1087i–1 of this title.

126. However, the Congress did not authorize or appropriate funds for a cancellation of these direct loans; the open-ended appropriation was only for the two specified purposes.

127. Appropriations "shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a). "A law may be construed to make an appropriation out of the Treasury . . . only if the law specifically states that an appropriation is made . . . ." *Id.* § 1301(d).

128. Cancellation of debt owed to the government would require an Act of Congress because it involved federal funds and therefore a congressional appropriation.

129. Starting in 1992, the President's budget "shall reflect the costs of direct loan . . . programs." 2 U.S.C. § 661c(a). Upon information and belief, the President's budget for FY 2022 or 2023 did not include the cost of the Biden LFP.

130. Article IV § 3, cl. 2 of the Constitution provides: "The Congress shall have Power to dispose of . . . Property belonging to the United States."

131. The student loans constitute accounts receivable/assets/property of the United States.

132.  Only Congress has the "[p]ower to release or otherwise dispose of the rights and property of the United States" and "[s]ubordinate officers of the United States are without that power, save only as it has been conferred upon them by Act of Congress or is to be implied from other powers so granted." *Royal Indem. Co.*, 313 U.S. at 294.

133.  Congress has not conferred the power to dispose of the student loans upon the Secretary or the Department.

134.  The Secretary is a "subordinate officer[] charged with the ministerial duty of collecting the [loans]." *Id.*

135.  The proposed payments to borrowers for funds they paid during the pandemic as loan repayments also require an appropriation of funds by Congress.

136.  Further, "[w]hen a payment is erroneously or illegally made it is in direct violation of article IV, section 3, clause 2, of the Constitution." *Aetna Cas. & Sur. Co. v. United States*, 526 F.2d 1127, 1130 (Ct. Cl. 1975).

137.  Because there is no act of Congress which either "specifically states that an appropriation is made" or "confer[s] upon" the Secretary the right  to cancel one half-trillion dollars' worth of student-loan accounts receivable or to pay funds directly to the borrowers, the Biden LFP is unconstitutional.

138.  The Secretary's actions violate 5 U.S.C. § 706(2)(B) and (C).

**COUNT IV**
**The Department of Education's action is invalid under 5 U.S.C. § 706 because it is arbitrary, capricious, or an abuse of discretion**.

139.  Plaintiff incorporates all her prior allegations.

140.  For an agency action to not be considered arbitrary, capricious, or an abuse of discretion, the agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins.*, 463 U.S. 29, 30 (1983).

141.  President Biden pre-determined that he would require the Department to forgive the subject loans before the Department did any fact finding or analysis and, upon information and belief, the Department simply engaged in post facto justifications to satisfy the President's directives.  The President and the Secretary were "determined to [forgive the debt] from the time [they] entered office." *Dep't of Com.* v. *New York*, 204 L. Ed. 2d 978 (2019).  They conformed their legal and factual analysis to the President's campaign and pre-midterm election promises for political gain.

142.  The Department of Education claims that federal borrowers who have certain loans and who are under the income cap are designated as affected individuals because (i) "the COVID-19 pandemic has been declared and continues to be a national emergency and [(ii)] the Federal Government has declared every State, the District of Columbia, and all five permanently populated United States territories to be disaster areas . . . ." Federal Student Aid Programs, 87 Fed. Reg. at 61513.

143.  The Department provided no further explanation for its income cap determination, no explanation for why only certain loans were eligible, no data to support

its decision, and no connection between living in a disaster area and debt relief for individuals who have not been required to make student loan payments since March 2020.

144. The Department determined to issue checks repaying borrowers who had honored their loan obligations and repaid a portion of their loans during the past two years, but not to those who had made such payments previously.

145. The only explanation the Department gives is that it has legal authority under the HEROES Act as determined by its lawyers. That is inadequate. *See Dep't of Homeland Sec.* v. *Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020) (rejecting DHS's reliance on an Attorney General memorandum finding it illegal for DHS to extend work authorization and other benefits to DACA recipients as a satisfactory explanation for rescission of a policy extending forbearance to childhood arrivals).

146. The Department's failure to articulate a satisfactory explanation for its actions other than because the Secretary has the supposed authority and believes it is necessary is arbitrary, capricious, and an abuse of discretion.

**COUNT V**
**The Department of Education's action exceeds its constitutional authority because the cancellation of student loans violates the Major Questions Doctrine.**
**5 U.S.C. § 706(2)(B); U.S. Const. art. I, § 1.**

147. Plaintiff incorporates all her prior allegations.

148. Under the APA, review may be had of agency action that exceeds constitutional authority. 5 U.S.C. § 706(2)(B).

149. When an agency action exceeds its authority, a court must "hold unlawful and set aside" such action. 5 U.S.C. § 706.

150.  Article I of the U.S. Constitution vests *all* legislative power in Congress.

151.  Congress may not delegate broad legislative power to the Executive, and the Executive may not exercise legislative power whenever it believes it is necessary.

152.  Waiving or modifying provisions of an Act of Congress is a legislative function that is vested solely in Congress and may not be exercised by an executive agency. *Util. Air Regul. Grp.* v. *Env't Prot. Agency*, 573 U.S. 302, 328 (2014) ("We reaffirm the core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate.").

153.  Where an agency is resolving a matter of great political significance and attempts to regulate a significant portion of the economy, the courts treat the agency's actions with increased skepticism. *West Virginia* v. *Env't Prot. Agency*, 142 S. Ct. 2587, 2608 (2022).

154.  The Department of Education writing off hundreds of billions of dollars owed to the federal government is inconsistent with how Congress makes "'radical or fundamental change' to a statutory scheme." *Id.* at 2609 (quoting *MCI Telecommunications Corp.* v. *American Telephone & Telegraph Co.*, 512 U.S. 218, 229 (1994)).

155.  In passing the HEROES Act, Congress could not have intended, nor could it have constitutionally, delegated such a momentous policy decision to an agency given the sheer scope of the claimed authority, its unprecedented nature, and the fact that Congress has failed to pass such a sweeping resolution while passing smaller remedies. *Alabama Assn. of Realtors* v. *Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2488-2490 (2021).

156. When Congress passed the CARES Act, it granted a suspension of loan payments to all federal student loan borrowers. Federal Student Aid Programs, 87 Fed. Reg. at 61513-514. Congress has, however, been unable to pass a sweeping resolution for student loan forgiveness. *E.g.*, Income-Driven Student Loan Forgiveness Act, H.R. 2034, 117th Congress (2021) (Proposed legislation that would require the Department of Education to forgive the outstanding balance of principal, interest, and fees due on federal student loans for eligible borrowers who meet certain income requirements. No action has been taken on this bill since March 2021).

157. Additionally, "'Congress could not have intended to delegate' such a sweeping and consequential authority 'in so cryptic a fashion.'" *West Virginia*, 142 S. Ct. at 2608 (quoting *Food & Drug Admin.* v. *Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000)). A broad reading of the HEROES Act would allow the Secretary "'unheralded' regulatory power over 'a significant portion of the American economy.'" *Id.* (quoting *Util. Air Regul. Grp.*, 573 U.S. at 324); *see* Swagel, *supra*.

158. Therefore, the broad forgiveness of student loans must come from Congress, not the Executive.

## COUNT VI
### Plaintiff seeks a declaratory judgement pursuant to 28 U.S.C. § 2201

159. Plaintiff incorporates all her prior allegations.

160. Plaintiff has an enforceable contract with the federal government in which she has promised to pay to the Department all funds she has borrowed pursuant to the MPN.

161. The Department's announced loan forgiveness program purports to modify the terms and conditions of the MPN.

162.  The Plaintiff is entitled to know the extent of her obligations under the MPN in light of the Department's announced Biden LFP.

163. The matters herein present a case of actual controversy within the jurisdiction of the Court.

164.  Plaintiff seeks a declaration from the Court of the rights and obligations of the Plaintiff (and those similarly situated) under the MPN.

**WHEREFORE**, Plaintiff asks this Court to enter judgment in her favor and to provide the following relief:

165.  A declaratory judgment holding that the Biden Loan Forgiveness Program exceeds the Department's constitutional authority and therefore violates the APA.

166.  A declaratory judgment holding that the Biden Loan Forgiveness Program did not go through proper rule-making procedures and/or is arbitrary, capricious, or an abuse of discretion and therefore violates the APA.

167.  Vacate and set aside the Biden Loan Forgiveness Program.

168. Preliminary and permanently enjoin the Defendants from enforcing, applying, or implementing the Biden Loan Forgiveness Program anywhere within the Department's jurisdiction.

169.  All other relief to which Plaintiff is entitled, including but not limited to attorneys' fees and costs.

170.  All other relief that this Court deems just and proper.

Respectfully submitted,

Dated: December 1, 2022

 _/s/ Jay R. Carson_
Jay Carson (#0068526)
David C. Tryon (#0028954)
THE BUCKEYE INSTITUTE
88 East Broad Street, Suite 1300
Columbus, Ohio 43215
(614) 224-4422
d.tryon@buckeyeinstitute.org
j.carson@buckeyeinstitute.org

*Counsel for Plaintiffs*